IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JANICE SEE,

          Plaintiff,

        vs.                              Case No. 05-1324-JTM

JO ANNE B. BARNHART,
Commissioner of Social Security

          Defendant.

## MEMORANDUM AND ORDER

Plaintiff Janice See has applied for disability insurance benefits (DIB) under Title II of the Act, 42 U.S.C. §§ 401 *et seq.*, and for supplemental security income (SSI) benefits, based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* Her application was denied initially and on reconsideration. The application was denied by the ALJ on January 27, 2005, a decision affirmed by the Appeals Council on September 23, 2005. There are two allegations of error. First, that the ALJ erred at Step Five in determining that See could make an adjustment to work which exists in significant numbers in the economy. Second, that the ALJ erred in assessing See's pain and credibility.

At the time of the onset of the alleged disability, See was 48 years old and had an eleventh grade education. She had previously been employed as a wire harness assembler in the aircraft industry. See claimed that she was disabled due to bilateral carpal tunnel syndrome, bilateral shoulder impingement, right-handed median nerve neuropathy, and an affective disorder. As a result, she testified, she cannot perform overhead reaching, cannot do "paper work," cannot grip small things without dropping them, and cannot lift over ten pounds.

The detailed facts are set forth in the plaintiff's brief (Dkt. No. 9, at 1-5), dispersed through the argument section of the Commissioner's brief,  (Dkt. No. 12, at 2-15) and discussed in detail in the ALJ's opinion. (R. 17-23).

The ALJ found that See had bilateral carpal tunnel syndrome (which prevented her from lifting 25 pounds on her right side), a diminished grip with nerve damage on the right hand, impingement of her right shoulder, and that these conditions were impairments which individually or collectively were severe limitations under S.S.R. 96-3p and 20 C.F.R. §§ 416.920 & 404.1520.  The ALJ also found that See suffered from an affective disorder which was controlled by  medication, and a gastroesophageal disorder, from which she had suffered for years, including the period during which she was employed. The ALJ found that these last two conditions were not severe under S.S.R. 96-3p.

Reviewing See's impairments pursuant to *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987), the ALJ found that See's impairments, while severe, did not meet or equal the level of severity of any impairment contained in Appendix 1, Subpart P, Regulation No. 4. The ALJ noted that See's counsel agreed at the hearing that the evidence did not demonstrate that See met any listed impairment.

Reviewing the medical evidence, the ALJ concluded that, while See had some limitations based on her impairment, the record did not support the extent of the disability claimed by her. See had been on Resperdal since 2000 for her mental condition, and she was noted to be "doing fine." (R. 22, 146). She has similarly been on medication for her gastroesophageal disease since at least 2001, and made no complaints of the condition in her August 13, 2003 examination by Dr. James G. Henderson, M.D.

See has had multiple surgeries in 2001 and 2002 to remediate repetitive stress injuries to her upper extremities.  The ALJ noted that See's work status "undulated slightly as she went through the healing process until she was found to be at maximum medical improvement for Workers Compensation purposes and permanent restrictions were placed." (R.18).  On January 11, 2001 (before her April 2

2

surgery of that year), Dr. James Gluck, an orthopedic surgeon, restricted See from lifting more than ten pounds, engaging in any repetitive pushing or pulling with the right arm, and reaching over her head. Ten days after the surgery, Dr. Gluck stated that See should not lift more than five pounds with her right arm, limited her reaching, pushing, or pulling with the right arm, and again stated she should not perform overhead work.

In May of 2001, the restrictions were altered so that See could lift up to ten pounds, and that she should not perform any "crimping" tasks. (R. 210). Crimping was a part of the work of See's former employment. Dr. Gluck reported on May 17, 2001, six and a half weeks after her shoulder surgery, that See was "doing very well" as to her shoulder. He noted that See also suffered from bilateral carpal tunnel syndrome, which he stated was "very mild at this point." (R. 177). He stated that See should avoid any crimping tasks in her work.

On June 14, 2001, Dr. Gluck stated that See was "very pleased" with the surgery, that her previous constant pain was now intermittent, and that "[o]n a pain scale 0 to 10, preoperatively her pain was an 8 and now it is a 3 to a 4." (R. 175). See reported "intermittent[] numbness and paresthesias" from her carpal tunnel condition. (Id.). Dr. Gluck concluded that See showed "significant improvement" as a result of the surgery, and that her tests of the carpal tunnel condition showed "[n]o significant atrophy and good strength and excellent motion." (Id) He gave See permanent restrictions, which he noted as including limited reaching and overhead work with the right arm, and no crimping. He did not attach any specific weight limit to her lifting. In a form completed August 20, 2001, Dr. Gluck stated that See could lift up to 20 pounds with "some restrictions." (R. 209).

See had right carpal tunnel surgery performed by Dr. Gluck in late 2001. On November 9, 2001, Dr. Gluck completed a Work Status form providing that See could return to work but stated that she should not lift more than five pounds and should avoid repetitive movement. He also noted that she

3

should engage in only "limited reaching & overhead work. No crimping." (R. 208). A month later, on

December 6, 2001, See reported increasing pain and numbness in her fingers. Dr. Gluck stated that See

should not lift more than ten pounds with the same restrictions. See was scheduled for additional

surgery, a  decompression of the median nerve in the right forearm, on January 15, 2002.

On March 7, 2002, Dr. Gluck stated the same restrictions applied, and noted that See told him

that those restrictions

> unfortunately [are] keeping her from work. We had given her similar restrictions in the
> past, and she could work. She states that she thinks they are going to shut her plant
> down and transfer the work to Mexico.

(R. 164). In her next visit, on April 18, 2002, See reported "tolerable" pain from her shoulder.

On October 17, 2002, the claimant was discharged from orthopedic care. Her discharge

summary stated that See complained:

1. Right shoulder. She states that she has an occasional mild discomfort in the right
   shoulder but remains pleased with the result of the surgery.

2. Left shoulder. She states that there is some intermittent discomfort in the left
   shoulder but at a tolerable level similar to the right.

3. Right hand. She feels that there is some improvement, however, persists with
   intermittent numbness and paresthesias primarily into the middle and ring fingers,
   and some tenderness into the forearm.

4. Left hand. She states she will intermittently have some numbness and paresthesias
   but not to a bothersome degree.

(R. 160). Examining See, Dr. Gluck found she had good strength and range of motion in her shoulder.

Her forearm was swollen. There was a full range of motion in the wrist and fingers. He found a

positive Tinel's sign over the distal aspect of the right forearm, but no thenar atrophy or weakness. Dr.

Gluck concluded that See was doing well a year and a half after her shoulder surgery, and that she had

otherwise reached "maximal medical improvement." (R. 161). He believed See should try to return to

work, and released her "with permanent restrictions to avoid repetitive overhead work and lifting. Limited use of vibratory tools and adjust activity to tolerance or pain.  She can lift 30 pounds to waist level and 20 pounds overhead."  (Id.)

The ALJ explicitly gave great, though not controlling, weight to this release because Dr. Gluck was See's treating physician.  (R. 20).  He noted that in this report, Dr. Gluck was giving his opinion after an examination and a determination that See had reached her maximum level of medical improvement after surgeries.

The ALJ then noted the December 5, 2002 review of See's records by Dr. Pedro A. Murati, M.D, who opined that See could not perform work which required climbing ladders, crawling, heavy grasping on either side, or lifting, carrying, pushing or pulling more than 20 pounds at chest level.  He stated that See could otherwise occasionally grasp, grab, lift, or carry 20 pounds, and could frequently use repetitive hand controls and lift or carry ten pounds.  She could not work more than eighteen inches from her body, and use no hooks, knives, or vibratory tools. The ALJ explicitly gave great weight to Dr. Murati's opinion because of his specialization in rehabilitation, and the general consistency between his findings and those of Dr. Gluck.

On November 14, 2002, See again consulted Dr. Gluck, and told him that she had been

> placed into a different job that day that she states is 'five times harder than my previous job.' ... She feels that she could go back to her regular job and states that her boss will not allow her to return because of what she states she was told were 'safety concerns.'

(R. 158).  Dr. Gluck reported that See had swelling in her fingers, and reported pain in her right forearm.  He told See she had not experienced any structural damage, and her restrictions should now include avoiding the repetitive grasping and twisting type of job that she had recently been doing.

See saw Dr. Gluck again on August 27, 2003. See told Gluck that she had been terminated from her job in November of 2002, some nine months previously.  See "came in today primarily wanting me

to write a letter explaining that she is disabled and is unable to work so that she could obtain social security benefits." (R. 156). Dr. Gluck stated: "I don't feel that there is any indication for any further diagnostic or therapeutic intervention. The patient even states that she does not want anything further done. Her primary concern is obtaining disability coverage." (R. 155). Dr. Gluck explained to See the difference between impairment and disability, and told her that "she is not completely disabled in that she can work but cannot do highly repetitive hand activity. I don't feel that we need to change the restrictions." (Id.)

On April 22, 2004, Dr. Gluck filled out a Kansas Social and Rehabilitative Services form stating that See could perform gainful employment with restrictions. He wrote that she could do no repetitive hand activity; no lifting over ten pounds, and could not use vibrating tools and limited her overhead reaching activities (R. 393). The ALJ gave lesser weight to this opinion, because it was given without an examination of See, and was at variance with his previous determination (based on a contemporaneous physical examination), that See could lift twenty pounds, and the explicit statement by Dr. Gluck that he did not believe See was disabled.

See was again examined by Dr. Gluck on August 2, 2004, and found that her reported diffuse symptoms were the same. Dr. Gluck stated he found See's condition to be stable, there was no evidence of significant structural abnormality, and reported there was nothing he could do orthopedically for her. He indicated no changes in the limitations or impairment, and told her that "she does have a permanent functional impairment and that it is not going to return completely back to normal" (R. 154). Dr. Gluck offered no changes from his original limitations or impairment rating. The ALJ noted that Gluck's notes were consistent with his prior examination notes from October 17, 2002 and November 14, 2002.

See testified that she is able to drive and does her own housework. Specifically, she testified she can vacuum, dust, and wash dishes for ten minutes at a time. She drives with her left hand because the vibration of the wheel bothers her right hand.  See has said that she can cook, and indeed cooked seven times per week, although she sometimes needed help opening jars. She can wash, dry and fold five loads of laundry per week.

See testified that she has constant stabbing pain and numbness in her hands. She testified that on a good day her hands go numb twice, but on a bad day the pain is so bad she has to recline and use a heating pad.

The ALJ found that See's reported activities of daily living are not commensurate with disability.  He further noted that See's claims of incapacitating and constant pain were inconsistent with her statements to Dr. Gluck that her pain was not bothersome and was intermittent. She stated at the hearing that she was taking no medication for this constant pain, even though she has the ability and willingness to take medication, as she is doing for her mental condition. Next, the ALJ noted inconsistent statements by the claimant.  See told Dr. Murati her physical therapy had helped her range of motion; she told the consulting physician assigned by the State, Dr. James G. Henderson, M.D., that physical therapy gave her no relief.  The ALJ concluded that See was not credible regarding her ability to work in light of her inconsistent statements, the absence of medication, her daily living activities, and the objective medical evidence.  (R. 22).

The ALJ concluded that See had a residual functional capacity (RFC) to perform a moderately restricted range of light work accompanied by some environmental and other restrictions.  She could not do the full range of light work because she cannot climb ladders, ropes, or scaffolds, can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, and cannot perform any

overhead work, rapid repetitive wrist movement, use vibrating tools, or perform repetitive hand activities. (R. 23).

See's prior employment as a wire harness assembler was semi-skilled light work. In response to a hypothetical question, the vocational expert testified that given an individual with the same age, education, work experience and the residual functional capacity as See could not perform any of her past relevant work. The ALJ accordingly found that See could not return to her former employment.

However, the ALJ then found that, considering See's RFC together with the testimony of the vocational expert, the claimant could perform some light and sedentary exertional-level work. The ALJ noted the testimony of the vocational expert that a person with See's limitations could work at light exertional-level jobs such as unskilled bakery worker (with 50,000 such jobs in the national economy and 480 such jobs in Kansas, and 120 in the local area), as an unskilled clerk (132,000 such jobs in the national economy, 1,200 such jobs in Kansas, and 300 such jobs in the local area), as an unskilled bus monitor (17,000 such jobs in the national economy, 340 such jobs in Kansas, and 80 such jobs in the local area), or at sedentary exertional level jobs such as an unskilled surveillance monitor (42,000 such jobs in the national economy; 500 such jobs in Kansas, and 140 such jobs in the local area), or an unskilled call-out operator (142,000 such jobs in the national economy, 1,200 such jobs in Kansas, and 270 such jobs in the local area). The ALJ therefore found that See could perform a range of jobs which exists in significant numbers, and concluded that she was not "disabled" under the Social Security Act.

The claimant's argument that the ALJ erred in determining she could perform a significant number of jobs is largely limited to reciting the requirements of the various positions cited by the ALJ, and then speculating without evidence that these jobs would in fact be too difficult for a person with her limitations. Thus, she recites the standard description of the call-out operator and suggests that this "*would seem* to be a job requiring repetitive hand activity." (Dkt. No. 9, at 11) (emphasis added). At

8

a similar level of speculation, claimant suggests that the definition of the bakery work position "*calls into question* whether it can be performed" without extending one's arms 18 inches from her body. (Id. at 9) (emphasis added). The claimant speculates that the preventive aspect of the school bus monitor would require such persons to physically enforce discipline on school buses. (Id. at 9). As to the security monitor position, claimant can only generally advance the argument that "[c]ommon sense indicates that most of the jobs identified would be precluded by a limitation in the use of the upper extremities." (R. at 12).

The claimant's arguments are unsupported by any evidence and in fact are contrary to the explicit definitions of the jobs in question. Nothing in the call-out operator or bakery work positions requires any physical abilities beyond those of a person with See's limitations. The bakery work position, for example, is largely composed of observing and reporting on an automated baking process, and the small amounts of physical activities actually required by the job — positioning cakes and sometimes smoothing icing — are tasks which can be performed with the physical limitations of See (who acknowledges cooking seven times a week). The claimant's attempt to recreate the school bus job finds no basis in the actual job description itself, the preventive aspect of which is limited to the job's actual duties of observing, and reporting, the conduct of the bus passengers; the job, after all, is that of a school bus *monitor*, and not a law enforcement officer. Finally, claimant presents no credible reason why a person with her limitations could not perform the task of security monitor.

There is no indication that any of the cited jobs require abilities beyond the RFC which the ALJ found that See retained. The ALJ did not incorporate Dr. Murati's recommendation about restricting See to extending her upper extremities beyond 18 inches from her body, and the claimant has not otherwise challenged the validity of the ALJ's RFC assessment. That RFC assessment does not preclude the occasional extension of the upper extremities. Instead, that RFC assessment is primarily centered

on restrictions associated with lifting more than 20 pounds on a sustained basis, and restrictions on repetitive hand motions. There is no evidence from which the court might reasonably conclude that the jobs in question are beyond the claimant's RFC.

Claimant's second argument is that the ALJ erred in his assessment of her credibility as to her claims of disabling pain. The argument is without merit; the ALJ properly analyzed the claimant's credibility within the framework of *Luna v. Bowen*, 834 F.2d 161, 163-64 (10th Cir. 1987), and the court finds no basis for rejecting that conclusion here. The ALJ is in the best position to assess a claimant's credibility, *Adams v. Chater*, 93 F.3d 712, 715 (10th Cir. 1996), and this court should overturn such an assessment only if there is a clear absence of credible evidence to support it. *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992).

Here, none of the examining medical sources concluded that See's pain was disabling. Her orthopedic surgeon explicitly stated that See's condition did not render her disabled. The ALJ's decision as to the credibility of the claimant is consistent with the objective medical evidence. The claimant's level of daily activities was legitimately considered by the ALJ. *Johnson v. Chater*, 87 F.3d 1015, 1018 (8th Cir. 1996). The claimant further made inconsistent statements about the level of her condition. She testified that her pain was constant and incapacitating; she told Dr. Gluck that it was only bothersome and intermittent. She told Dr. Henderson that the physical therapy gave her no relief; she told Dr. Murati that the physical therapy was helpful. Finally, the ALJ could and did legitimately take into account the absence of efforts by the claimant to relieve her allegedly disabling pain. As the ALJ noted, the claimant testified she was not taking any medication for her pain. As the ALJ also noted, when See saw Dr. Gluck on the last occasion, she specifically disavowed any desire for further medical intervention, indicating instead that she was interested only in a medical statement for the purposes of presenting a disability claim. The failure of a claimant to seek palliative medical treatment for

supposedly disabling pain is a legitimate consideration in assessing the claimant's credibility.  *See Qualls v. Apfel*, 206 F.3d 1368, 1372-73 (10th Cir.2000).  The court finds no error in the ALJ's credibility determination.

IT IS ACCORDINGLY ORDERED this 24th day of July, 2006, that the claimant's Appeal from the decision of the Commissioner is hereby denied.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE